(36 South. 287.)

No. 14,636.

Succession of DAUPHIN.*

CHOPPIN et al. v. DAUPHIN.

(Jan. 18, 1904.)

LIMITATIONS — JUDGMENT — SETTING ASIDE — FRAUD—DISCOVERY—DESCENT AND DISTRIBUTION—RECOVERY OF INTERESTS—PLEADING—AMENDMENT—INTERVENTION.

1. The action to annul a judgment for fraud is prescribed by one year, dating from the discovery of the fraud, and the burden of proof is on the plaintiff in nullity to show when the discovery was made. If the evidence leave this date in doubt, the prescription will be maintained, especially where the information as to the alleged fraud was communicated to the plaintiffs by letter, and the letter is not produced nor its nonproduction accounted for.

2. A mere general statement that the discovery was made within the year will not suffice, particularly where, from the circumstances of the case, the probability is strong that it was made sooner.

3. Where by judgment a succession has been closed, and the executrix discharged and sent into possession as universal legatee, and 10 years afterwards the heirs of the first wife of the deceased bring suit against this universal legatee, and allege that certain property, of which one-half belonged to the first community, was fraudulently abstracted by her from the succession, and is now in her possession, and pray judgment directly in their own favor for their half of this property, thereby seeking relief outside of the succession proceedings, and on the theory that the ownership of the property in question can be litigated directly between themselves and the defendant individually, and the case is tried on the issue as to whether the property in question belonged or not to the first community, the plaintiffs cannot, after the evidence has been closed and the case fixed for argument, file a supplemental petition asking that the judgment closing the succession and discharging the executrix and sending her into possession be annulled, and the succession be reopened, and the defendant be destituted as executrix, and a dative testamentary executor be appointed, and the defendant be condemned to account to this executor for the property in question. Such supplemental petition would alter the substance of the demand contained in the original petition. It would be the ingrafting of a new suit upon the pending suit.

4. Nor can this new suit be thus ingrafted upon this pending suit by means of an intervention on the part of the alleged heirs of the forced heir of the deceased. Such intervention would be further objectionable in that for its

*Rehearing denied April 11, 1904.

trial the case would have to be reopened and further evidence taken, and thus the trial of the main suit be retarded.

Breaux, J., dissenting.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

In the matter of the succession of Maximilien A. Dauphin. Action by Sherburne G. Choppin and others against Rosa L. Dauphin. Judgment for petitioners, and defendant appeals. Reversed.

Clegg & Quintero and Saunders & Gurley, for appellant. Henry Laurence Lazarus, Thomas Marshall Miller, Jonathan N. Luce, George W. Flynn, and Hermann Michel, for appellees.

PROVOSTY, J. The late Dr. M. A. Dauphin was twice married. His first wife was Cecilia Choppin. He was married to her in 1866, and she died August 2, 1883. Between them the community of acquets and gains existed. He did not open her succession, or cause an inventory to be made of the community property, or make any settlement with her heirs, but simply continued in the possession and enjoyment of the community property until his death. As survivor in community he was entitled to the usufruct of his wife's half of the property until he should marry again. This he did after an interval of four years. In November, 1887, he married Rosa La Branche, the defendant in this case; and three years after this second marriage, on the 28th December, 1890, he died.

His succession was duly opened, his will probated and ordered to be executed, an inventory made, and his executors qualified. The executors were Paul Conrad, who died before the institution of the present suit, and the surviving wife, Mrs. Rosa La Branche Dauphin, the defendant in this suit, who was also universal legatee under the will. Mrs. Barbara Fauth Dauphin, the mother of the deceased, survived him, and was his forced

heir for one-third of his estate, and also a special legatee under the will for 100,000 francs. There were some other special legacies unnecessary to be mentioned. The inventory showed $146,157.50 of assets.

Four months after the opening of the succession, the heirs of Cecilia Choppin, the first wife, brought a suit against the executors, and against Mrs. R. L. Dauphin individually. They alleged that by virtue of their said heirship they were joint owners with the succession of Dauphin of certain property described in their petition, and that the succession of Dauphin owed them over $100,000. They alleged, further, that the deceased had fraudulently concealed from the heirs of his first wife over $200,000 worth of property. They prayed for a partition, and for judgment condemning the succession to pay them $100,-000. After trial and judgment, but before signature of judgment, a compromise was entered into between the said heirs and the executors, according to which the judgment, which had been rendered and entered on the minutes but not yet signed, was to be recast so as to conform with the written reasons for judgment of the judge, and the plaintiffs were to receive $40,000 in full satisfaction of their rights, claims, title, and interest in the property, real and personal, belonging to the community existing between the late M. A. Dauphin and his predeceased wife, Cecilia Choppin, as well as of all their claims, as such heirs, of any nature whatsoever, against the succession of M. A. Dauphin, and also against his surviving wife, Rosa La Branche Dauphin. The judgment was accordingly recast, and duly signed on June 17, 1902, and the compromise duly carried out by the payment of the $40,000.

Mrs. Barbara Fauth Dauphin, mother of the deceased, also brought suit against the executors, and on the same day on which the suit was filed, November 24, 1891, she sold all her rights, title, and interest as forced heir of her son to Paul Conrad, the executor, for $30,500. In making this purchase Paul Conrad was in reality acting for his co-executor, Mrs. Dauphin, the defendant in the present suit.

Four days thereafter, June 28, 1891, the executors filed a petition in which they alleged that all the debts had been paid and all the legacies discharged; that the Choppin heirs had brought suit and obtained judgment, and that the judgment so obtained had been paid and satisfied; that Mrs. Barbara Fauth Dauphin had sold all her rights, title, and interest in the succession to Paul Conrad; that the petitioner R. L. Dauphin was universal legatee under the will; and that all the debts having been paid and all legacies discharged, and all the claims of the heirs, as well as the claims of the heirs of the predeceased wife, Cecilia Choppin, to her share of the community property, having been paid and satisfied in full, the petitioner Rosa L. Dauphin was entitled to be recognized as universal legatee and sent into possession, and the executors to be discharged. They prayed that they be discharged from their trust, their bonds be canceled, their sureties released, and Mrs. Rosa L. Dauphin put in possession as universal legatee. They filed with their petition the act of compromise with the Choppin heirs, and that of transfer by Mrs. Barbara Fauth Dauphin to Paul Conrad, and exhibited proof of all other claims against the succession having been settled. On the same day judgment was rendered as prayed for. The judgment was thus rendered without citation of the heirs, and without publication of notice to the creditors of the filing of the final tableau of the executors.

Under this judgment Mrs. Rosa L. Dauphin went into possession as universal legatee. The legal effect of this was to make her personally liable for all the debts of the succession in case any remained unpaid, and also to terminate and finally close the succession.

Ten years after these events, on the 8th of

April, 1901, the original petition in the present suit was filed. The suit having been filed in the proceedings in the matter of the Succession of M. A. Dauphin, the defendant excepted that the Succession of Dauphin having been finally closed, and the suit being a separate and distinct suit, it should have been regularly filed and allotted as an ordinary suit under the rules of court. This exception was overruled, and thereupon, on May 14, 1901, with reserve of her exception, the defendant filed a plea of prescription, pleading in bar of plaintiff's suit the prescription of five years, as given in article 3542, Civ. Code, and the prescription of one year, as given in article 613, Code Prac.

In support of her plea of prescription of one year—that is to say, to show at what date the plaintiffs acquired the information upon which they base their allegation of fraud—defendant caused subpoenas duces tecum to be issued to the plaintiffs and their resident counsel for the production of letters and documents. Before the plea of prescription had been disposed of, plaintiffs, on June 6, 1901, filed a supplemental petition increasing their demand, and propounding interrogatories on facts and articles to the defendant. The plea of prescription was overruled, and defendant on October 18, 1901, with reserve of all exceptions, filed her answer. The trial was then proceeded with. It began on January 2, 1902, and continued, with interruptions, until March 12, 1902, when the evidence was closed, and the case was set for argument on April 1st following. On March 27th, 15 days after the close of the trial, and 5 days before the day set for the argument, three persons, alleging themselves to be the heirs of Mrs. Barbara Fauth Dauphin, filed a petition of intervention in their own behalf and in that of their coheirs; and on the same day the plaintiffs in the main suit filed a second supplemental petition. Defendant excepted to the filing of these petitions, on the ground

that they came too late, and changed the issues; and, this exception having been overruled, she applied to this court for writs of mandamus and prohibition to correct the ruling by which the filing of the petitions had been allowed. This court refused to interfere, holding that the remedy was by appeal. The defendant then again excepted to the intervention and to the second supplemental petition, and set forth at length the objections to the filing of same. This exception was in turn overruled. The case was then reopened for the taking of further evidence. Evidence was taken on the subject of the heirship of the interveners, and all the evidence theretofore taken in the suit was, over the objections of the defendant, reoffered in globo. There was judgment against defendant, and she has appealed.

As the case stands before this court, the first point to be considered is the ruling of the lower court permitting this second supplemental petition and this intervention to be filed; for upon that depends what are the issues and who are the parties.

### Second Supplemental Petition.

It is plain that the second supplemental petition should not have been allowed to be filed. It "altered the substance of the demand by making it different from the one originally brought," and the Code of Practice is express that amendments can be allowed only "provided" they do not have this effect. Code Prac. art. 419. The admission or rejection of this petition is a very important point in the case, and therefore we give it a somewhat extended treatment.

The original petition being extremely lengthy, only the substance of it can be given. It alleged:

First. "That they [the petitioners] are the sole surviving heirs of Mrs. Cecilia Choppin, the deceased wife of the late Maximilien A. Dauphin, and were duly recognized as such

by a judgment of this honorable court, in the matter of the Succession of Maximilien A. Dauphin, No. 31,780 on the docket."

Second. "That as such sole heirs they are entitled to one-half of the property of the community of acquets and gains that existed between the said Cecilia Choppin and the deceased, M. A. Dauphin, all of which was kept by the said deceased until his death, without any inventory or other record having been made of same to show of what same consisted."

Third. "That at the death of M. A. Dauphin the defendant, Rosa La Branche Dauphin, his surviving wife, abstracted and concealed, so as to avoid inventorying same as part of the succession of Dauphin, certain negotiable securities, amounting to $155,500, described in a list annexed, and that said securities formed part of the said community between M. A. Dauphin and Cecilia Choppin."

Fourth. "That the said Dauphin left a will, which treated the entire property of the succession as his own, taking no account of the rights of the heirs of Cecilia Choppin, and which, after certain legacies, made the second wife of said Dauphin, Rosa La Branche Dauphin, universal legatee, appointing her and one Paul Conrad executors. That the succession was opened and an inventory made, and that said executors qualified. That this inventory was not a true inventory, but was false, and intended to practice a fraud, it not including the abstracted and concealed securities in question, as the said Rosa La Branche Dauphin well knew."

Fifth. "That it was only recently and within the past year that the facts above recited, with reference to the abstraction of the property of said succession by Rosa La Branche, came to the knowledge of petitioners."

Sixth. "That in April, 1891, the petitioners instituted proceedings in the Succession of M. A. Dauphin, seeking to establish the community rights inherited by them from Cecilia Choppin, but that, being ignorant of the existence of the said abstracted and concealed securities, or of other property belonging to the said community of acquets and gains, they were unable to show a larger amount of property than that shown by said inventory, and accordingly, on the 13th of May, 1892, judgment was rendered in their suit on the basis of the said incorrect inventory."

Seventh. "That after the rendition of said judgment, but before the signature thereof, a compromise was entered into between petitioners and the said Mrs. Rosa La Branche Dauphin, and the said judgment was recast and finally signed, but was thus signed before the lapse of three judicial days required by law, and was therefore prematurely signed, and is in consequence an unsigned judgment. That said compromise was induced by the fraud of the said Rosa La Branche Dauphin in abstracting and concealing said securities, and that, in so far as said agreement of compromise is relied upon to release and discharge the rights of your petitioners in and to the succession of said Cecilia Choppin, the same is null and void, and without force and effect."

Eighth. That, simultaneously with entering upon negotiations with the petitioners for compromise, Paul Conrad, one of the executors, purchased the rights of Mrs. Barbara Fauth Dauphin, the mother of M. A. Dauphin, and his forced heir for one-third of his estate, for the price of $30,500, the purchase being made on the basis of the inventory, and that this transaction was not known to the petitioners until after they had made the compromise.

Ninth. That said judgment thus fraudulently obtained, upon evidence which your petitioners have within the past year discovered to be false and untrue, "should be decreed null and void, inoperative, and without effect, in so far as it undertakes to determine and limit the property rights of peti-

tioners, and their interest in the estate of the community heretofore existing between Cecilia Choppin and said Maximilien A. Dauphin"; and that "the compromise effected between petitioners and said Mrs. Rosa La Branche Dauphin, if not decreed to be null and void, being based upon documents since found to be false, should be held to be restricted, operative, and effectual alone upon the property therein specifically described, and not to affect or control, because of its nullity, property not embraced in said compromise and agreement, and not contemplated thereby."

"Petitioners represent that said transaction or compromise, because of its nullity, consequent upon the fraud practiced as aforesaid, in no manner affects the rights of your petitioners as herein asserted, nor does it release or discharge said Mrs. Rosa La Branche from accounting to petitioners, as the heirs of Cecilia Choppin, for their remaining interest in her estate, and which interest is represented by the securities above enumerated, of the value of $155,500, and which securities belong to the community existing between the said Mrs. Cecilia Choppin and her husband, Maximilien A. Dauphin, and were abstracted from the succession of said Dauphin as aforesaid."

"Petitioners represent that having converted said securities to her own use, the said Mrs. Rosa La Branche is liable to petitioners for the present market value thereof, and for interest collected thereon from December 30, 1890, at which time she appropriated and converted to her own use, benefit, and advantage the estate of the community existing between said Cecilia Choppin and Maximilien A. Dauphin."

"Petitioners represent that after the adjustment between them and said Mrs. Rosa La Branche, or about that time, she came into the actual possession and the custody of the securities aforesaid, and utilized a part of same for the purpose of effecting said compromise, and as the purchase price of the interest of the aforesaid Mrs. Barbara Fauth Dauphin in the succession of her son, as well as paying large attorney's fees in order more effectively to have the benefit of counsel in securing to herself the advantages herein complained of, and to the prejudice and wrong of petitioners, in the practicing of fraud upon the court of probate charged with the administration of the succession of Maximilien A. Dauphin. That Mrs. Rosa La Branche is presently, and has been since the date last aforesaid, in possession of said securities, or funds realized from the disposition thereof, and that she is liable to an accounting to your petitioners for said securities specifically, or at their highest market value, as well as all interest collected thereon from the date of her unlawful possession and detention thereof."

"Wherefore, the premises considered, petitioners pray that Mrs. Rosa La Branche, widow of the late Maximilien A. Dauphin, be duly cited to appear and answer hereto; that, after due and legal proceedings had, there be judgment in favor of your petitioners and against said Mrs. Rosa La Branche, decreeing that the judgment of this honorable court rendered on May 13, 1892, as amended and recast on June 17, 1892, be annulled, vacated, and set aside, in so far as it undertakes to determine the property rights belonging to the succession of Cecilia Choppin, or the interest of said succession in the community between Cecilia Choppin and Maximilien A. Dauphin, her husband; that the articles of agreement and compromise entered into on the 3d of June, 1892, between petitioners and said Mrs. Rosa La Branche, be decreed to be null and void and of no effect, because of the concealment of facts and the false documents upon which it was based, in so far as said compromise undertakes to adjust, settle, and compromise the rights of petitioners in the estate of said Cecilia Choppin; or that, if it be decreed that said com-

promise be not absolutely null and void, then the effect of said settlement, adjustment, and compromise be declared limited and restricted to the purchase of the interest of your petitioners in the property specifically detailed and enumerated in said article of settlement and compromise.

"Petitioners further pray that, after due and legal proceedings had, there be judgment in their favor and against Mrs. Rosa La Branche, widow of the late Maximilien A. Dauphin, condemning her to account for all of said securities and the interest collected thereon, or, in default, to pay unto your petitioners the sum of $155,000, or so much thereof as shall be adjudged to belong to the succession of Cecilia Choppin, as widow in community of her husband, the said Maximilien A. Dauphin, together with the interest she had collected on the various securities enumerated in the body of this petition from January 1, 1891, to date, and interest upon said sums of interest, capitalized from year to year, at the rate of 5 per cent. per annum; and decreeing that said property hereinabove enumerated constituted a part of the community existing between said Cecilia Choppin and her said late husband, Maximilien A. Dauphin, and that petitioners are entitled to recover the same or the value thereof; and petitioners finally pray for all costs and for general relief."

Such was the original petition. The first supplemental petition, filed June 6, 1901, increased by $40,000 the amount of the securities said to have been abstracted, and alleged that with the securities there was abstracted and concealed over $50,000 in cash. Further, it propounded interrogatories on facts and articles to the defendant, and contained the following allegation, which is copied entire, as the plaintiffs greatly rely upon it:

"That neither the negotiable instruments referred to, nor the cash abstracted as aforesaid, were accounted for by her as executrix of the succession of M. A. Dauphin, nor were the same embraced in the inventory of the succession of M. A. Dauphin, but were purposely and intentionally concealed from your petitioners, who, as the heirs of Cecilia Choppin, were entitled to an accounting thereof, the said property constituting part of the community theretofore existing between the said M. A. Dauphin and his deceased wife, Cecilia Choppin, as it was plainly and manifestly the duty of the said Mrs. Rosa La Branche Dauphin, as executrix of said estate, holding the position of trust, and in the possession of the assets and effects of said M. A. Dauphin, to honestly account for all the property coming into her possession as executrix, to the court of probates charged with the jurisdiction and administration of the affairs of said succession, and led your petitioners to believe at all times that, as executrix and trustee, she had faithfully administered upon the affairs of said succession, and duly accounted for all property coming into her possession in her representative capacity as executrix of said estate."

The prayer, after asking leave to file and citation, and that defendant be required to answer the interrogatories on facts and articles, proceeds as follows:

"Petitioners pray as in their original petition, and, further, that after the decree herein prayed for is entered, that they have due and proper accounting of all property belonging to the successions of M. A. Dauphin and Cecilia Choppin."

The prayer of the second supplemental petition, to the filing of which defendant objected as altering the nature of the demand, is as follows:

"Wherefore petitioners pray that the judgment heretofore rendered herein, in so far as it affects or purports to affect any securities, moneys, and property not inventoried and not accounted for, be annulled and vacated and set aside; that there be judgment against said Mrs. Rosa La Branche Dauphin, declaring and decreeing to be the property of

the estate of M. A. Dauphin: [Here follows enumeration of properties.]

"Plaintiffs further pray that, in default of the recovery of the original securities and property, and the securities, assets, and property acquired therewith, that the succession of Dauphin and plaintiffs have judgment against the said Mrs. Rosa La Branche Dauphin for the value thereof.

"Plaintiffs further pray that said Mrs. Rosa La Branche Dauphin be made to account fully to said succession for any and all property, securities, and moneys, or the value thereof, not already accounted for.

"Plaintiffs further pray that the judgment heretofore rendered, in so far as it closes said succession of M. A. Dauphin and discharges the executor and executrix, be set aside; that said succession be reopened, and a dative testamentary executor be appointed; that all property, moneys, securities, their proceeds, or the profits therefrom and acquisitions therewith, not inventoried and accounted for, be brought back into said succession, subject to be administered and distributed to the parties entitled thereto.

"Plaintiffs further pray as in their original and supplemental petitions."

A comparison of this second supplemental petition with the original petition and the first supplemental petition will plainly show that it alters the substance of the demand, and that it should not have been permitted to be filed.

In substance, the original petition was to the effect that the petitioners had been recognized as heirs of Cecilia Choppin, and as such were entitled to her share in the property of the first community; that Mrs. Dauphin had fraudulently abstracted part of this property, and should be condemned to account for one-half thereof to the petitioners; that the compromise and the judgment fixing the amount of the property of the first community had been induced by fraud, and should be annulled in so far as they determined and

fixed the amount of the said property. In brief, the plaintiffs asserted title to certain property, and prayed that the defendant be condemned to account to them for same, or to pay the value thereof, and, incidentally, that the judgment and the compromise which stood in the way of said relief should be annulled in so far as standing in the way.

The title propounded was the title of the plaintiffs alone, as heirs to one-half of the first community; the relief demanded was relief in favor of the plaintiffs alone; the judgment sought was one which the plaintiffs would themselves enforce and collect. No attack was made on the judgment closing the succession; there was no prayer that the succession should be reopened; it was not suggested that the administration of the succession should be resumed; no judgment was asked in favor of the succession. The issue was simply whether the plaintiffs should recover a personal judgment in their own favor against Mrs. Dauphin.

On the other hand, in the second supplemental petition, plaintiffs ask:

(1) That the property described in their original petition be decreed to belong to the succession of Dauphin.

(2) That "the judgment heretofore rendered, in so far as it closes said succession and discharges the executor and the executrix, be set aside."

(3) That the said succession be reopened.

(4) That a dative testamentary executor be then appointed.

(5) That a judgment be rendered against Mrs. Dauphin, and in favor of the succession, for the value of the property described in the original petition.

(6) That this judgment and its proceeds be administered in the succession of Dauphin.

Contrasting the points of difference between the original and the second supplemental petition, we find that:

(1) In the original petition the plaintiffs acted solely in their own interest; in the

second amended petition they act in the interest of others also.

(2) In the original petition the plaintiffs assumed that the succession was closed, and Mrs. Dauphin liable by reason of that fact and of her alleged possession; in the second supplemental petition the plaintiffs seek to treat the succession as still pending.

(3) In the original petition the plaintiffs asserted only their own title, which could not have originated after August 2, 1883, the date of the termination of the first community by the death of Cecilia Choppin; in the second amended petition they assert the title of Dr. Dauphin, which might have originated after August 2, 1883.

(4) In their original petition the plaintiffs demanded relief outside and independent of the succession proceedings; in their second supplemental petition they demand within and through the succession proceedings.

(5) In their original petition the plaintiffs did not attack or seek to avoid the judgment of June 28, 1892, closing the succession; in their second supplemental petition they demand the reopening of the succession and the resumption of its administration.

In brief, the object of the amended petition was to annul the judgment or proceedings that had closed the succession, to restore its administration, and to bring under this revised administration certain described property or its value. The object of the original petition had been to procure a personal judgment, independent of any succession proceedings, for the interest which the plaintiffs alleged they had in the same property.

The original petition propounded and tried the title of the first community, ending August 2, 1883; the amended petition propounded the title of Dr. Dauphin.

The ultimate question under the original petition was: Shall the plaintiffs get and enforce in their own favor a judgment against Mrs. Dauphin? The ultimate question under the amended petition was: Ought certain property to have been administered in the succession of Dr. Dauphin, and shall the proceedings of that succession be reopened and resumed so as to administer that property?

To defeat the original demand it was only necessary to show that the first community had not been shown to own, and could not be presumed to have owned, the property in controversy. To defeat the amended petition it would be necessary to show either that Dr. Dauphin had never acquired the property in controversy, or that, if he had acquired it, he had parted with the title thereto before his death.

Comparing the two demands, it is found that the parties for whose benefit the proceedings are instituted are different, the relief and judgments demanded are inconsistent, and the evidence needed to protect the defendant is different.

When plaintiffs brought their suit they were confronted with a judgment—that of June 28, 1892—which purported to close the succession of Dauphin, discharge his executors, and put his universal legatee in possession. If this judgment was valid, then the universal legatee, Mrs. R. L. Dauphin, would be personally and directly liable to the plaintiffs, and they could enforce their claims against her, without regard to the succession. But if this judgment was not valid, then the claims of plaintiffs must be enforced in and through the succession administration. The plaintiffs elected to treat the judgment as valid, and brought their suit on the theory that the succession was closed. They even offered the judgment itself in evidence, in their own behalf, in proof of the facts which it decreed. The succession could not be both closed and not closed. The plaintiffs elected to treat it as closed, and to prove that it was closed, and it is inconsistent for them to take the position after-

wards in the same suit that it was not closed. So the plaintiffs had to elect whether they would assert their own alleged title in certain property and proceed directly against Mrs. Dauphin as they could have proceeded on the same title against any other wrongful possessor of the same property, or whether they would take steps to bring the property back into the succession first, and then assert their alleged title thereto. They could not, and cannot now, take both of these courses at the same time and in the same suit, as is attempted to be done. We think that, clearly and plainly, this second supplemental petition should not have been allowed to be filed.

### Intervention.

As already stated, the intervention was by persons claiming to be the heirs of Mrs. Barbara Fauth Dauphin, mother of M. A. Dauphin. The interveners claim to be the legitimate children of Theodore Dauphin, one of the sons of Mrs. Barbara Fauth Dauphin.

Their petition of intervention is virtually a repetition of the original petition of the plaintiffs, with such changes only as were requisite to suit the different relief to be prayed for. This relief is the same precisely as that of the second supplemental petition of the plaintiffs.

Manifestly, the filing of the intervention should not have been allowed. The Code of Practice (article 391) is express that an intervention can be allowed only "provided it do not retard the principal suit," and manifestly this intervention would have that effect. It raised new issues for the taking of evidence on which the case would have to be reopened. These issues were the following: (1) As to the heirship of the interveners—an issue involving the question whether the mother of the interveners was married to Theodore Dauphin, of whom they claimed to be the children. (2) As to the nullity vel non of the sale made by Mrs. Barbara Fauth Dauphin of her rights in the succession of M. A. Dauphin to Paul Conrad. (3) As to whether the property in question belonged to the succession of M. A. Dauphin, assuming that it had been acquired after the death of Cecilia Choppin and the dissolution of the first community. (4) As to the nullity vel non of the judgment of June 28, 1892, closing the succession of Dauphin, and discharging the executors and canceling their bond. In the disposition of the first of these issues—that as to the heirship of the interveners—a regular trial had to be gone into. On the issue as to whether the property in question belonged to the succession of Dauphin, assuming that it had been acquired after the death of Cecilia Choppin and the dissolution of the first community, the interveners offered in globo the evidence taken on the trial of the issue as to whether this property had been acquired by M. A. Dauphin before the death of Cecilia Choppin and during the existence of the first community. Manifestly the testimony part of this evidence, including the documents offered in connection therewith, and as to which the witnesses were examined, was inadmissible, it having been taken upon a different issue. Therefore, in order to try this new issue, all the testimony would have to be taken over again, and the work of several months be gone over with.

Not only this intervention raised new issues the trial of which would necessarily retard the principal suit, but it brought forward a different and inconsistent demand. The theory of the suit had been theretofore that the succession had been closed by the judgment of June 28, 1892, and that the defendant was individually in possession of the property in question, and that the litigation over the ownership of this property could be carried on between the plaintiffs individually and the defendant individually outside of the succession, and a judgment could be

rendered directly in favor of the plaintiffs against the defendant; and such had been the demand. On the other hand, the theory of this intervention was that the succession had not been closed, and the defendant had not been discharged as executrix, and that the property in question belonged to the succession of Dauphin, and should be accounted for to the succession, to be dealt with as succession property; and the demand was in accordance with this new theory.

### Action in Nullity of Judgment.

The intervention and the second supplemental petition being eliminated, the case remains, as originally, a suit by the Choppin heirs, alleging their ownership of certain property as having belonged to the first community, and now belonging to them as sole heirs of the share of Cecilia Choppin in the said community, and demanding a judgment against Mrs. Dauphin personally for said property; and demanding, incidentally, that the compromise of 1892 and the judgment of June 17, 1892, be annulled, in so far as they determined and fixed the amount of the property of the first community.

The allegations and prayer in connection with this demand in nullity are as follows:

"That it was only recently, and within the past year, that the facts above recited, with reference to the abstraction of the property of said succession by Rosa La Branche, came to the knowledge of the petitioners.

"That the said judgment [of June 17, 1892] rendered upon evidence which your petitioners have, within the past year, discovered to be false and untrue, * * * should be decreed to be null and void, * * * in so far as it undertakes to determine and limit the property rights of petitioners, and their interest in the estate of the first community."

And the prayer is that said judgment "be annulled, vacated, and set aside, in so far as it undertakes to determine the property rights belonging to the succession of Cecilia Choppin, or the interest of said succession in the first community."

There is also the allegation that the judgment of June 17, 1892, was prematurely signed, in that it was signed on the same day on which it was rendered, instead of after the expiration of the three judicial days allowed by law for application for new trial; but this ground of nullity is not pressed, and is evidently frivolous.

Both from the allegations and the prayer it distinctly appears that the judgment of June 17, 1892, was asked to be annulled on no other ground than that of fraud, and that it was asked to be annulled only in so far as it was affected by the fraud; that is to say, only in so far as it "determined the property rights belonging to the first community."

Under the express terms of the Code of Practice, the suit to annul this judgment had to be filed in the same court which had rendered it; hence the filing of plaintiffs' suit in the court wherein the proceedings in the matter of the succession of Dauphin had taken place.

Also, in order to set forth their demand in nullity with legal sufficiency, it was necessary for plaintiffs to allege that their knowledge of the fraud in question had come to them within the past twelve months; and accordingly we find that this necessary allegation is duly made.

To the attack thus made upon this judgment, defendant pleads the prescription of one year. But before proceeding to the consideration of this defense, and also of the defense of res judicata pleaded in connection with it, we will notice the argument of counsel of plaintiffs in support of the filing of the supplemental petition and of the intervention, and also the reasons of the judge a quo for allowing same.

Argument of Plaintiffs' Counsel in Support
of the Filing of the Second Supplemental
Petition and of the Intervention.

It is said by counsel for plaintiffs in argument that, without the filing of the second supplemental petition, the same relief could have been granted. That the demand of the original petition, as amended by the first amended petition, and as enlarged by the answers of defendant to the interrogatories on facts and articles, and by the evidence received on the trial without objection, and by the answer filed by defendant, was as follows: (1) That the judgment of June 17, 1892, be set aside. (2) That the defendant be condemned to account for all of the abstracted property. (3) That said property be decreed to constitute part of the first community. (4) For general relief.

It is pointed out that the first supplemental petition alleged as follows:

"That neither the negotiable instruments referred to, nor the cash abstracted as aforesaid, were accounted for by her as executrix of the succession of M. A. Dauphin, nor were the same embraced in the inventory of the succession of M. A. Dauphin, but were intentionally and purposely concealed from your petitioners, who, as the heirs of Cecilia Choppin, were entitled to an accounting thereof, the said property constituting part of the community theretofore existing between said M. A. Dauphin and his deceased wife, Cecilia Choppin, as it was plainly and manifestly the duty of said Rosa La Branche Dauphin, as executrix of said estate, holding the position of trust, and in the possession of the assets and effects of said M. A. Dauphin, to honestly account for all the property coming into her possession, as executrix, to the court of probates charged with the jurisdiction and administration of the affairs of said succession, and led your petitioners to believe at all times that, as executrix and trustee, she had faithfully administered upon the af-

fairs of said succession, and duly accounted for all property coming into her possession in her representative capacity as executrix of said estate."

It is also pointed out that the prayer of this first supplemental petition was to the effect that the petitioners should "have due and proper accounting of all the property belonging to the successions of M. A. Dauphin and Cecilia Choppin"; and it is said that "there can be no question but what, under the original petition and foregoing amendment, recovery was sought against Mrs. Rosa L. Dauphin by virtue of her faithlessness to her trust and obligations as executrix; by virtue of her and her coexecutor having made a false and fraudulent inventory; by virtue of her concealment and abstraction of the securities described in the petition; by virtue of her failure to fully and completely account for all the property of the successions, both of M. A. Dauphin and Cecilia Choppin.

"The cause of action, seeking to hold her liable, was by reason of her maladministration of the affairs and property of the succession of M. A. Dauphin, in her capacity as executrix."

It is said that the pleadings had been further enlarged by the interrogatories on facts and articles, and the answers thereto, without objection. That "these interrogatories were a searching inquiry into all the matters and facts affecting the affairs of the first community, the conduct and administration of the succession of M. A. Dauphin by Mrs. Dauphin, as executrix, and her coexecutor, and into the concealment and abstraction of the securities described in the petition."

### First Amended Petition.

We will first consider the effect of this first amended petition in altering the nature of the demand of the original petition—how far the suit was converted by it from a suit by the plaintiffs, distinctively as heirs of the wife in the first community, against the de-

fendant individually for specific property, or the value thereof, alleged to have belonged distinctly to the first community, into a suit by the plaintiffs, as parties interested in the succession of Dauphin, against the defendant for the rendition of an account to the succession; in other words, how far the first amended petition asked the same relief as the second amended petition.

In this first amended petition there was not a word said of annulling or setting aside the judgment by which the executors of the succession of Dauphin had been discharged and the succession closed, and it is hardly necessary to say that the setting aside of this judgment was a condition precedent to the demand for a further accounting from Mrs. Dauphin to the closed and defunct succession. The failure to ask that this judgment be set aside shows conclusively that there was no intention to ask that the succession be reopened and an account be rendered to it. Had the plaintiffs intended to ask for any such relief, they would have prayed as in their second supplemental petition, namely, (1) that the judgment closing the succession and discharging the executors be set aside; (2) that the succession be reopened; (3) that the succession of Dauphin have judgment against the defendant, and that the property in controversy be brought back into the succession. Instead of this, the plaintiffs renewed the prayer of their original petition, and prayed specially that they themselves have an accounting of the property in question.

This was the demand of a personal judgment in their own favor against Mrs. Dauphin individually, on the assumption that the succession of Dauphin had been finally closed and had ceased to be an element, in the problem.

But there is no need of argument to show that the second supplemental petition demanded a different relief from that which had been demanded theretofore, since we find that the petition of intervention, prepared and filed by the counsel for plaintiffs, "denies the right of the plaintiffs at this time to the specific relief sought in the original and supplemental petitions."

After having thus denied the right of the plaintiffs to the relief which they had been asking theretofore, it is no longer open to counsel for plaintiffs to take the position in argument that the first amended petition demands the same relief as the second amended petition.

### The Answer as Enlarging the Issues.

In her answer defendant alleges that "a true and faithful inventory was made of the property of M. A. Dauphin, and that the succession was duly settled, all the property being accounted for." This is the allegation of the answer that is relied on as having enlarged the demand of the original petition. Thereby, say counsel, defendant presented, "expressly and unqualifiedly, these issues: (1) That a true and faithful inventory was made of the property of M. A. Dauphin; (2) that all the property was accounted for."

Counsel refer also to the following allegation of defendant's answer:

"That each and every allegation of plaintiffs' petition and supplemental and amended petition, whereby it is sought to charge that your respondent herself, or by or through another, took or received, after the death of Maximilien A. Dauphin, any of the property of his succession or estate and converted same to her own use, to the injury and prejudice of the plaintiffs, is wholly untrue.

"That all allegations in the original or supplemental petitions which charge that respondent concealed from the court, or from any one else, any fact respecting the property of the estate of Maximilien A. Dauphin, or joined any other in the practicing of any fraud or concealment of any nature respecting the assets of the said estate, are untrue."

But it is evident that these allegations of

the answer did not raise new issues, or alter in the slightest degree the demands of the petition of plaintiffs; they were nothing more than a specific denial of the allegations of the petition, and the substance .of these denials would have been just as fully and effectively conveyed, so far as mere pleading is concerned, by the filing of a simple general denial.

The plaintiffs were not asking for a judgment in favor of the succession of Dauphin, but in their own favor; they were not suing for the property of the succession of Dauphin, but for their share of specific property alleged to have belonged to the first community and to have been abstracted by defendant while same figured as part of the succession of Dauphin. Even if defendant had wanted to, she could not have converted this suit of the plaintiffs for their share of the specific property of the first community into a suit by the succession of Dauphin for an accounting to itself.

Evidence Received without Objection, and Answers to Interrogatories on Facts and Articles as Enlarging the Issues.

Evidence received without objection can enlarge the pleadings only where such evidence was inadmissible under the pleadings, and would have had to be excluded if objected to. As a matter of course, evidence admissible under the pleadings cannot have the effect of enlarging the pleadings. If it had such effect, the issues in every case would have to be ascertained from the evidence instead of from the pleadings. On the point of whether the evidence in question and the answers to the interrogatories in question were admissible under the pleadings, there can be no doubt. Counsel for plaintiffs themselves say on the subject:

"There can be no question but what, under this original petition and amendments prior to the March amendment [second supplemental petition], the evidence adduced was clearly admissible, and that by such averment of the original pleadings the issues which were incorporated in the amended petition of March 27th was set out."

If the evidence was admissible under the pleadings, its admission without objection clearly could not have the effect of enlarging the pleadings.

The Prayer for General Relief as Enlarging the Issues.

The prayer for general relief may, like charity, cover a multiplicity of sins, but it cannot work a miracle; it cannot convert a demand by the plaintiffs for a judgment in their own favor, outside of the succession, against the defendant individually, for specific property, on the theory that the succession has been closed by final judgment, into a demand for a judgment, in favor of the succession, dismissing the defendant from the executorship and condemning her to render an account to the succession.

Reasons for Judgment of Judge a Quo.

Our learned Brother of the district court allowed the filing of these petitions on a theory which is stated by him in his reasons for judgment, as follows:

"Other exceptions were filed, all of a technical nature; that is, that the amendments changed the issues tendered by the first petition, that the relief sought was different, that the amendments and interventions came too late, etc. Regarding the suit as one by parties claiming interest, in which they charged the defendant, as executrix, with the fraudulent appropriation or embezzlement of the assets of this succession, which had been opened and allotted to this division, and in which they attacked, as absolute nullities and as mere devices to screen her fraud and secure its fruits, the orders and judgments procured by her as executrix, and sought to set aside the compromises of November, 1891, and of June, 1892, with Mrs. Barbara Fauth

and the heirs of Choppin, as to any effect they might have on this suit to bring back to the succession property alleged to have been fraudulently abstracted from it by defendant while executrix, my judgment was that the rules applicable to pleading and to interventions in ordinary cases were not applicable.

"If plaintiffs and interveners alleged the truth in their original complaints, respectively filed, the case propounded was that M. A. Dauphin died; that his widow, executrix, and testamentary heirs had received his entire property; that she had inventoried and accounted for a part of it, say about $140,-000 in round numbers, and had concealed and embezzled the greater part, say about $200,-000 in round numbers; and that as heirs of his only forced heir, and as heirs of his first wife, they had the right to compel her to produce and restore the part of the property which she had embezzled to the probate court, to which the entire succession of all of its property had been allotted for settlement, and through whose authority she had only legal access to said property.

"As to the plaintiffs, it seemed to me that, as to all matters of essential averment, the original petition was ample, and that all amendments to it were mere surplusage, and that if there had been no prayer, except for citation and general relief, the case propounded, to wit, the case of embezzlement of succession funds by the executrix and instituted heir, was brought within the power of the court, as the allotted court of probates, to' deal with it and render such judgment as might coerce the return and administration, for the benefit of all parties having any interest, of the abstracted property.

"As to the interveners, they could come in at any time to claim what might be due to the forced heir. Their intervention did not retard the suit, and if they had not intervened at all the court's duty was, on the complaint of the plaintiffs, to hear the case and bring

back for administration and proper distribution the property which was alleged to have been embezzled by the executrix."

The learned judge a quo thought that the provisions of the Code of Practice governing the allowance of amendments and interventions in ordinary cases were not applicable to this case, because this case was nothing more than an effort on the part of persons interested in a succession to bring back into it property alleged to have been fraudulently abstracted from it by the executrix, and incidentally to set aside as absolute nullities certain contracts and judgments which stood in the way of this relief. He thought that the original petition was ample for this relief; that the second supplemental petition was mere surplusage; that, as to the intervention, it did not retard the suit; and, even if it had not been filed, the relief it seeks could have been granted on the complaint of the plaintiffs.

If the suit as propounded in the original petition had been what our learned Brother here states that it was, perhaps this ruling might have been correct; but it is not true that the suit as propounded in the original petition was an effort on the part of persons interested in the succession of Dauphin to bring back property into it. This is the effort of the second amended petition and of the intervention, but the scope and theory of the original petition was entirely different from this. The distinct and clear-cut purpose of the original petition was to obtain a judgment outside of the succession, and directly in favor of the plaintiffs themselves against Mrs. Dauphin individually, for the first community's half of certain specified property alleged to be in the possession of Mrs. Dauphin. The judgment closing the succession and discharging the executors and canceling their bond was not asked to be set aside; on the contrary, the theory of the suit was that the succession had been closed by this judgment, and that

therefore the litigation over the property in question could be conducted, outside of the succession, in a suit distinctly between the defendant individually, as claimant and possessor of the property, and the plaintiffs, individually, seeking a judgment directly in their own favor for their half of this property. So true is this that, on the trial, the plaintiffs offered this judgment in evidence in support, of their demand, namely, to show that the succession had been closed, and the defendant placed in possession as residuary legatee. True, this purpose is not explained in the offer in so many words, but such explanation was entirely unnecessary, since the offer could have no other object in view, the judgment not being evidence of any other fact, and its offer in evidence not having been purposeless. It certainly was not offered for the purpose of showing that the succession had continued to be open and the executors not discharged and the defendant not placed in possession.

The error into which our learned Brother fell was to substitute the theory and demand of the second supplemental petition and of the intervention to the theory and demand of the original petition. Of course, if this is done, the second supplemental petition, and, for the matter of that, the intervention, become useless surplusage, and the same relief could be granted as well without as with them, as our Brother says; but if this is not done, the suit as originally propounded continues to be what we have above stated it to be, and not what our learned Brother states it to be, and the only relief that can be granted in it is that distinctly prayed for, namely, a judgment directly in favor of the plaintiffs individually against the defendant individually for certain specific property.

The issues raised by the original petition, and which were tried, were (1) whether the property in controversy was not acquired by Dauphin previous to the 2d of August, 1892,

the date of the termination of the first community, and did not in consequence belong to the first community; (2) whether the compromise entered into between the parties in 1892 was not null because induced by the alleged fraud; and (3) whether, because of the same fraud, the judgment obtained by the plaintiffs against the succession of Dauphin in 1892 was not null in so far as it determined and fixed the amount of the property of the first community.

The second supplemental petition raised these same issues, and, in addition, the following: (1) Whether, if the property in question was not acquired by Dauphin during the first community, it was not acquired by him subsequently thereto, and did not in consequence belong to his succession, though not to the first community, and should not in consequence be accounted for to his succession; (2) whether the judgment closing the succession of Dauphin, and discharging the executors and putting the universal legatee in possession, was not fraudulently obtained, and should not for that reason be set aside, and the succession be reopened, or be held never to have been closed; and (3) whether the defendant should not be destituted as executrix, and a dative testamentary executor appointed.

The intervention raised the same issues as the second supplemental petition, and also, in addition, the following: (1) Whether the sale made by Mrs. Barbara Fauth Dauphin of her rights, title, and interest in the succession of her son, M. A. Dauphin, to Paul Conrad, was not null, as having been induced by fraud. ·

This second supplemental petition and intervention was therefore an attempt to ingraft upon the suit which had been already tried a new suit, and to substitute to the original plaintiffs new plaintiffs, and, at that, a new suit in some respects inconsistent with the first.

Our learned Brother considered that a case

had been made out of the despoilment of the succession of Dauphin, and that, his court having been charged with the settlement of that succession, it was his duty to cause the property to be brought back into the succession for regular administration. In thus thinking, he fell into two serious errors: In the first place, no issue of the despoilment vel non of the succession of Dauphin had been tried before him, but only of the despoilment vel non of the first community. Until plaintiffs had shown that the property in question had been acquired before the death of the first wife and the dissolution of the first community, defendant was not called upon to open her mouth in defense. In the second place, the task of courts is hard enough to deal with cases as made up by the pleadings, without going outside of the pleadings to deal with cases which possibly the parties might have presented to the court but in point of fact did not.

How far the judgment closing the succession could be disregarded is a question that need not be gone into. It having been rendered without citation of the heirs, it was, of course, res judicata of nothing; but how far it may have had the effect, nevertheless, of closing the succession and putting the universal legatee in possession, is another question. On which, see: Succession of Duffy, 50 La. Ann. 795, 24 South. 277; Hart v. Connolly, 49 La. Ann. 1587, 22 South. 809: Godwin v. Neustadtl, 47 La. Ann. 853, 17 South. 471; Atkinson v. Rodney, 35 La. Ann. 314.

### Res Judicata.

This brings us to the consideration of the plea of res judicata. Defendant urges that the suit brought by the plaintiffs in 1892 against the executors and herself personally had the same object in view as the present suit, and that the judgment in that suit has the force of the thing adjudged, and bars the present controversy.

To this contention plaintiffs reply that the judgment of June 17, 1892, was not a judgment, for the reason that it was rendered after the matter in litigation had been compromised, and after, therefore, there were no longer any parties litigant, or any suit. In support of this, plaintiffs refer to decisions where courts have refused to deal with moot cases, or with cases where there were not two litigants. Kohn v. Ins. Co., 15 La. 86; Bosio v. Picton, 106 La. 249, 30 South. 699; Huey v. Kroutter, 106 La. 450, 30 South. 892; Chamberlain v. Cleveland, 1 Black, 419, 17 L. Ed. 93; Lord v. Veazie, 8 How. 251, 12 L. Ed. 1067; Earl of Bandon v. Becher (before the House of Lords) 3 Clark & Finally, 508. The principle of these decisions is contested by no one, but it has application only where, without there being any actual litigants, the court is called upon to decide something. In the instance here in question the court was not called upon to decide anything after the compromise had been entered into, but merely to sign a judgment already rendered by the judge and entered upon the minutes. The signature of the judge is no part of the judgment, but merely a formality prescribed by law for the better authentication of it. The most that can be said against this judgment is that it was in a sense a consent judgment, since the parties waived their right to ask for a new trial; but if it had been a consent judgment altogether, its aptitude for serving as a basis for res judicata would not thereby be impaired. We are nowhere taught that consent judgments do not constitute the thing adjudged. Indeed, what better guaranty can the law have of the correctness of a judgment than the consent of the parties, and what better reason for refusing to permit the litigation to be opened up anew?

As we view the situation, this judgment which recognized and decreed the heirship of the plaintiffs, and as against the succession of Dauphin decreed their ownership of

certain property, and condemned the succession of Dauphin to pay a certain amount of money, was part of the thing for which Mrs. Dauphin, under the compromise, paid to plaintiffs the $40,000 called for by the compromise. Mrs. Dauphin, as purchaser of the rights of the plaintiffs, had an interest in having this judgment put in regular and final form by having the signature of the judge affixed to it. Far from being an agreement that this should not be done, the compromise must be looked upon as an agreement that it should be done. As a matter of fact, by referring to the memorandum of the compromise as drawn up between counsel, it is seen that the express agreement was that the judgment should be recast. This could mean nothing else than that as recast it should be duly signed.

The contention of plaintiffs that this judgment could not be signed, that the effect of the compromise was to terminate the suit so completely that no step could thereafter be taken in it, not even the merely formal step of affixing the signature of the judge to the judgment, so that, in point of fact, there never was any judgment, is strangely in contradiction with the very first recital of the notarial act evidencing the compromise, which is an express reference to this very judgment as having judicially established and decreed the heirship of the plaintiffs; and is also strangely in contradiction with the first allegation of their petition in the present suit, which is that they "are the sole surviving heirs of Mrs. Cecilia Choppin, the deceased wife of the late Maximilien A. Dauphin, and were duly recognized as such by a judgment of this honorable court in the matter of the Succession of Maximilien A. Dauphin, No. 31,780 on the docket." The judgment thus here recited and relied upon as a final judgment is the very same judgment which plaintiffs say could not be signed and was therefore never legally signed. The plaintiffs not only thus allege and rely upon this judgment in their pleadings, but they offered it in evidence in this case in proof of their heirship. After thus setting up and using this judgment, the plaintiffs could not assail it, even if it were an absolute nullity. They would be estopped. Daniels v. Tearney, 102 U. S. 421, 26 L. Ed. 187; Simpson v. Lewis, 19 La. Ann. 457.

Plaintiffs also allege, but do not press in argument, that this judgment is an unsigned judgment, because the judge's signature was affixed to it prematurely, before the expiration of the three judicial days for new trial. This objection is evidently frivolous.

Counsel claim that this judgment is not res judicata of the present demand, for the further reason that it did not cover or bear upon the property now sued for, but covered only the property included in the inventory. This contention is utterly untenable. In 1892 plaintiffs sued to recover everything that as heirs of Cecilia Choppin they were entitled to from the succession of Dauphin. If in that suit they failed to recover any property that they are now claiming, it was because of the deficiency of their proof, not by reason of their having failed to make allegations. They alleged that the first community owned over $200,000 of property more than appeared in the inventory, and prayed judgment for the $100,000. They even brought against the deceased a charge of fraudulent concealment, similar to the one now brought against defendant. That suit was, like the present one, a suit to make good the plaintiffs' rights in the first community, and the judgment rendered in it is necessarily, therefore, res judicata of the demand in the present suit, until set aside in an action of fraud.

The plaintiffs in their petition allege that this judgment "should be decreed null and void, * * * in so far as it undertakes to determine and limit the property rights of petitioners and their interest in the estate of the first community." This is an express

admission and judicial allegation that said judgment does "determine and limit" the rights now urged by plaintiffs in the present suit.

It is evident that this judgment is res judicata of the present suit, and must operate as a bar to it, unless set aside in an action of fraud.

### Prescription.

Against the attack on this judgment on the ground of fraud the defendant pleads the prescription of one year, and the next thing necessary to be considered is this plea. The Code of Practice (article 613) provides that the action for annulling a judgment on the ground of fraud "must be brought within the year after the fraud has been discovered," and the question raised by defendant is whether the plaintiffs did not discover the facts on which they base themselves, in their allegation of fraud, more than one year before the institution of their suit.

The information as to the facts in question came to plaintiffs through the attorneys now representing them in the case. As early as April, 1899, Mr. George W. Flynn, one of these attorneys, was possessed of this information; and on the 14th of October, 1899, Messrs. Lazarus & Luce, the other counsel, wrote to Judge Sherburne, also of counsel, to get the procurations of the heirs, and Judge Sherburne at once set to work doing so. Mrs. Covarrubias lived in Berlin, Germany; Mrs. Payne, in Virginia; Sherburne Choppin and Mrs. Fisher, in the city of New Orleans; all the other plaintiffs lived together on a plantation near Alexandria, La. Judge Sherburne resided in Baton Rouge, La. At the time the suit was brought the powers of attorney of Mrs. Covarrubias and Sherburne Choppin were held by Mr. George W. Flynn, those of the other heirs by Judge Sherburne.

As the communications between these counsel and the plaintiffs preliminary to bringing the suit, and also between the counsel and

other counsel and parties in New York City, had presumably been by letter, and would show the date when the plaintiffs were first informed of the alleged fraud, the defendant, for the purpose of fixing the initial point of the prescription, took out subpœnas duces tecum, addressed to the plaintiffs and to the resident counsel, for the production of any letters that might have passed between the parties, and also for the production of any powers of attorney or other documents that might have been executed between them. The subpœnas were served only on the parties living in New Orleans. Mr. Flynn gave the date of the powers of attorney held by him, and pleaded privileges as a reason for not producing the letters which had passed between him and the parties in New York. The two resident plaintiffs returned that they had neither sent nor received any letters relating to the matter. The communications of Messrs. Lazarus & Luce with the plaintiffs had been through Judge Sherburne, and as these gentlemen were not called upon to produce the letters between them and Judge Sherburne, but only the communications between them and the plaintiffs, they returned that no letters had passed.

On the trial of the plea of prescription, Mr. George W. Flynn and Judge Sherburne, who held the powers of attorney of the heirs, testified, and also five of the plaintiffs, namely, Sherburne Choppin, Mrs. Estelle Choppin Fisher, Clifford O. Choppin, Emma E. Choppin, Marie Choppin, and Arthur R. Choppin. Why the other five plaintiffs did not testify is not explained.

Bearing as it does on a fact so recent, a fact which, judging from the acrimony with which this suit has been conducted, was of very great interest to the plaintiffs, this testimony, we must say, is exceedingly unsatisfactory. And for this condition of it the plaintiffs are responsible, for the fact in question—the time when they learned of the fraud they complain of—was peculiarly with-

in their knowledge, and not within the knowledge of the defendant. In view of the unsatisfactory condition of this testimony, it may be well, before proceeding further, to advert to the principles governing the burden of proof in the matter.

The right of action to annul a judgment for fraud is not unconditional or perpetual; it is subordinated to the condition that the action "must be brought within the year after the fraud has been discovered." Code Prac. art. 613. And the burden of proof is on the plaintiffs in nullity to show when the knowledge of the fraud was acquired. Expressly so held in Farrar v. Peyroux, 7 Rob. 92; Wheat v. Union Bank, 7 Rob. 94. And such information as ought to put the plaintiff on inquiry will suffice to start the course of the prescription. "If," said this court in the case of Bory v. Knox, 38 La. Ann. 379 (which was a suit to annul a judgment on the ground of fraud), "an opportunity is afforded to a party to know and learn about a certain matter bearing on his interest, and he fails or refuses to profit by it, if he closes his eyes to the notice spread before him and shuts his ears to oral information directly imparted to him, the law will hold him as bound by the same, and as fully notified as if he had taken thorough personal cognizance at the time of the information imparted and of the notice given."

On this subject of the duty of the plaintiffs in nullity to allege and prove the time and circumstances of the discovery of the fraud complained of, the following somewhat extended excerpt from the decision of the Supreme Court of the United States in the case of Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807, furnishes a full and satisfactory statement of the law. And it is of safe application in this state, since, in administering relief from fraud, our courts exercise the same jurisdiction as ordinary courts of equity, and, in the absence of special statutory regulations, ought to be guided by the same

principles; and we have no special statutory regulations on the subject, the Code of Practice contenting itself with giving the action (article 607), and limiting it to one year from the discovery of the fraud (article 613).

At page 140, 101 U. S., 25 L. Ed. 807, the court said:

"The discovery of the cause of action, if such it may be termed, is thus set forth: 'And the plaintiff further avers that he had no knowledge of the facts so concealed by the defendant until the year A. D. 1872, and a few weeks only before the beginning of this suit.' There is nothing further upon the subject.

"In this class of cases the plaintiff is held to stringent rules of pleading and evidence, 'and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, by ordinary diligence, the discovery might not have been before made.' Stearns v. Page, 7 How. 819, 829 [12 L. Ed. 928]. 'This is necessary to enable defendant to meet the fraud and the time of its discovery.' Moore v. Greene, 19 How. 69, 72 [15 L. Ed. 533]. The same rules were again laid down in Beaubien v. Beaubien, 23 How. 190 [16 L. Ed. 484], and in Badger v. Badger, 2 Wall. 95 [17 L. Ed. 836].

"A general allegation of ignorance at one time and of knowledge at another are of no effect. If the plaintiff made any particular discovery, it should be stated when it was made, what it was, how it was made, and why it was not made sooner. Carr v. Hilton, 1 Curt. 230 [Fed. Cas. No. 2,436].

"The fraud intended by the section which shall arrest the running of the statute must be one that is secret and concealed, and not one that is patent or known. Martin v. Smith, 1 Dill. 85 [Fed. Cas. No. 9,164], and the authorities cited.

" 'Whatever is notice enough to excite at-

tention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.' Kennedy v. Greens, 3 Myl. & K. 722.

" 'The presumption is that if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.' Angell, Lim. § 187, and note.

"A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and, if he had the means of discovery in his power, he will be held to have known it. Buckner and Stanton v. Calcote, 28 Miss. 432, 434. See, also, Nudd v. Hamblin, 8 Allen (Mass.) 130.

"In Cole v. McGlathry, 9 Me. 131, the plaintiff had given the defendant money to pay certain debts. The defendant falsely affirmed he had paid them, and fraudulently kept the money. It was held that the plaintiff could not recover, because he had at all times the means of discovering the truth by making inquiry of those who should have received the money.

"In McKown v. Whitmore, 31 Me. 448, the plaintiff handed the defendant money to be deposited for the plaintiff in bank. The defendant told the plaintiff that he had made the deposit. It was held that, if the statement were false and fraudulent, the plaintiff could not recover, because he might at all times have inquired of the bank. In Rouse v. Southard, 39 Me. 404, the defendant was sued as part owner of a vessel for repairs, and pleaded the statute of limitations. The plaintiff offered evidence that the defendant, when called on for payment, had denied that he was such owner. It was held that, as the ownership might have been ascertained from other sources, the denial was not such a fraud-

ulent concealment as would take the case out of the bar of the statute."

On the subject of prescription in general, the court in the same case says:

"Statutes of limitation are vital to the welfare of society, and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity, and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and antidote go together."

Thus it is seen that the burden of proof is on the plaintiffs in nullity to show at what date the discovery of the fraud was made; and it is seen also that such information as ought to put the plaintiff on inquiry is sufficient to start the running of the prescription; and it is seen further that in this class of cases the plaintiff is held to "stringent rules of pleading and evidence."

This stringency as to pleading does not obtain under our system of practice. Under our loose system of pleading, the mere negativing in general terms of the presumption which would otherwise arise from a comparison of dates—of the date of the judgment sought to be annulled and of the date of the filing of the suit in nullity—would be sufficient. But there is no reason why the same stringency as to evidence should not obtain in our courts as in ordinary courts of equity, or in the courts of law, which, like ours, administer equitable relief against fraud; and therefore, when it comes to the evidence, to borrow the language of the court in this case of Wood v. Carpenter, "a general allegation of ignorance at one time and of knowledge at another is of no effect. If the plaintiff made any particular

discovery, it should be stated when it was made, what it was, how it was made, and why it was not made sooner."

Coming to the evidence of the plaintiffs, we find that five of them did not testify at all, and that the five who testified are exceedingly vague in their statements. The fact that the attorneys who represented them in the suit were possessed of the information more than 18 months before the filing of the suit made it doubly incumbent upon the plaintiffs to discharge satisfactorily this burden placed upon them by the law to show the circumstances under which, and, as far as possible, the exact date when, they did acquire the information. Now, let us see what their testimony is:

Dr. Arthur Choppin testifies that he employed counsel "about May, 1900, I think it was." That the first knowledge he had of the alleged fraud was "within this year." He was examined May 31, 1901. His communications with Judge Sherburne were by letter. That the date of the correspondence was "about May last."

Miss Emma Choppin does not remember the date: "Within a year, I imagine;" "within the last year, I would say." Does not remember the date. One or two letters may have passed before the power of attorney was signed. (Date of power of attorney, May 12, 1900.)

Clifford Choppin: "About a year ago, I think;" "within the last year." Sherburne Choppin: "I was asked to call at his office [Mr. G. W. Flynn's] to see him." "Q. When was that? A. That was shortly before signing this power of attorney." (Date of power of attorney, May 12, 1900.)

Miss Marie Choppin: "I couldn't say; I don't remember when I first learned of the alleged fraud. Q. Is it a year ago? A. I could not say exactly the time; I think it must be within a year." The power of attorney was signed "some days," "I suppose a day or two," after it had been received for

signature. The matter had been a matter of correspondence.

Mrs. Estelle Choppin Fisher does not remember when Judge Sherburne was engaged. The power of attorney will show. Knew nothing previously.

All five of the plaintiffs say the first definite information they had as to the facts of the case was when they read their own petition in the newspapers.

The written amicable demand made by the plaintiffs upon the defendant bears date May 12, 1900, and therefore antedates the powers of attorney.

Judge Lazarus testifies that the firm of Lazarus & Luce had been professionally retained prior to the execution of the powers of attorney, but he cannot remember the date of the employment.

We make from the testimony of Mr. Geo. W. Flynn the following extract:

"Q. I notice you have produced a power of attorney to you by Mrs. Covarrubias, which is dated 24th April, 1900. That power of attorney was in response to a letter, I presume, written by you to her? A. Yes, sir. Q. Do you recollect the date of that letter? A. I will tell you the transaction. I don't suppose the transaction occupied five minutes altogether. You can figure: Take the date of the receipt of the letter and the date of the power of attorney, and you can figure about the time I wrote the letter. I guess I wrote that letter about the middle of April. Mr. Sherburne Choppin called at my office at one time; he was waiting some time in the anteroom, and finally came in, and he introduced himself as Mr. Sherburne Choppin; I think he said Mr. B. B. Howard told him to come and see me; I asked him what he wanted to see me about, and he said he heard that I knew something about the succession of Dauphin; I told him I had little or no information. I think that statement I afterwards reiterated to Judge Clegg upstairs in the clerk's office, and I told him I had heard there

was something wrong in the succession of Dauphin, by which the heirs did not get their rights; I knew no particulars then, knew nothing about it. I mentioned the matter to Judge Lazarus, and Judge Lazarus told me he was satisfied there was something wrong. He asked me then would I take his case; I told him I did not see what good it would do to take his case, as he was only one heir, and there were several, and I would not undertake to take a suit for his account, and carry on the litigation without something tangible. He then said he had a sister in Berlin, and they together represented a one-half interest; he asked me would I write to her, and I said I would; I am not sure whether I wrote, or he did, to Mrs. Covarrubias; at any rate, I forwarded the power of attorney to her; it came back with a note stating her husband refused to sign it with her, and she wanted to know if there was any law in Louisiana by which I could use a power of attorney without her husband's signature. That's the full extent of my communication with Mr. Sherburne Choppin and Mrs. Covarrubias. Q. The postmark on the back of the envelope in which the power of attorney was returned to you by Mrs. Covarrubias seems to me to read 'Berlin,' something like 'April 24.' Isn't that a fact? A. Yes, sir. Q. Showing it was made in Berlin on the 24th of April? A. Yes, sir. Q. And the postmark in New Orleans was May 7th? A. Yes, sir, the date received here. Q. Showing it took something like two weeks to get here? A. Yes, sir; I have another communication, substantially the same thing, shows ten to twelve days. Q. You have no way of fixing the date of the letter? A. That I wrote? Q. That you wrote to Mrs. Covarrubias, inclosing this power of attorney that she returned to you. A. No other way, except the figuring out the date, and deducting about twelve days from the postmark here. Q. This is the only communication you had with her?

A. The only communication I had with her up to that time; yes, sir; and that communication, I recollect, was simply on note paper, and did not occupy three or four lines; I was dependent on her brother, Mr. Sherburne Choppin, advising her to give me the power of attorney; I knew that nothing I could say would induce her to give it to me; she was a stranger to me." Cross-examination: "Q. Isn't it a fact you hunted up Mr. Sherburne Choppin? A. It is not a fact. Q. Didn't you leave a note at his office asking him to call? A. I did not."

Further on, on cross-examination, Mr. Flynn testifies that Mr. Sherburne Choppin employed him "about the 10th or 11th of April [1900]. Q. Possibly before that date? A. It may be, but I don't think."

The suit was filed on the 8th of April, 1901.

Judge Sherburne testifies as follows:

"Mr. Lazarus informed me of the fact of the existence of these securities, and then I obtained the powers of attorney from the heirs—a portion of them—to bring this suit. I do not recollect the exact time, some time in the early part of last year [1900], I think, or the latter part of the year previous [1899], a little while previous to the institution of this suit. Judge Lazarus communicated with me, and I went to work and got authority of the Choppin heirs to institute this suit. Q. Judge Sherburne, how long were you engaged in getting these powers of attorney after you communicated with Judge Lazarus? A. Well, it was several months. Q. You were several months engaged in getting these powers of attorney? A. Yes, sir; the heirs were distributed over a good scope of country, and it took me some time. Q. In writing to the heirs, did you inform them why you wanted the powers of attorney? A. Yes, sir; I gave them the facts I had been put in possession of. They were already informed, or, at least, they believed like I did, of the existence of missing securities."

Further on, Judge Sherburne testifies as follows:

"Q. I want to get this matter a little bit straightened out. As I understand, you had a moral conviction that a large amount of property had been kept out of the succession of Mr. Dauphin? A. Yes, sir. Q. You felt absolutely certain of it in your own mind, although you did not have legal evidence of it? A. Yes, sir. Q. And, with that conviction, you proceeded to make a compromise? A. Yes, sir. Q. Now, subsequent to that compromise, several years afterwards, you received a written communication from Judge Lazarus telling you that securities had been found. Is that a fact? A. Yes, sir. Q. You proceeded to get the powers of attorney of the heirs of Arthur Choppin, giving them the information which Judge Lazarus had given you, and these powers were to authorize you to bring the present suit? A. Yes, sir. Q. You were several months engaged in getting these powers of attorney? A. Yes, sir."

As already stated, the communication of Judge Lazarus, or of Messrs. Lazarus & Luce, to Judge Sherburne, was of date October 14, 1899.

This testimony is very vague. Mr. Flynn does not remember dates. He is not positive whether it was he or Mr. Sherburne Choppin who wrote to Mrs. Covarrubias for her power of attorney. He is positive that Mr. Sherburne Choppin called at his office and introduced himself and employed him, and that he did not look up Mr. Sherburne Choppin. Mr. Sherburne Choppin, on the other hand, was asked the question, "Where and when were you first approached by Mr. Flynn respecting these proceedings?" and he answered, "I was asked to call at his office to see him, sir."

Dr. Arthur Choppin testifies that he is positive he employed counsel "within this year." Miss Emma Choppin, that she learned of the alleged fraud "within a year, I imagine"; "within the last year, I would say."

Clifford Choppin: "About a year ago, I think"; "within the past year."

Miss Marie Choppin: "I think it must be within a year."

Now, these witnesses were thus testifying on the 31st of May, 1901. Their testimony would therefore make it that they had learned of the alleged fraud after the 31st of May of the previous year, whereas their powers of attorney bear date the 12th to 18th of May of the previous year. Therefore, according to their testimony as compared with the date of their powers of attorney, they first heard of the fraud or employed counsel after they had executed the powers of attorney.

This illustrates the little value of such a vague and general statement as evidence, when bearing, as in this case, on a narrow margin of time, and when made after the lapse of a certain length of time. If it bore on a wide margin of time, it might carry considerable, if not complete, probative force. A man may be quite positive that a conversation of which he does not remember the exact date took place more than a year ago, but not so long as two years ago; but if he does not remember the exact date of a conversation or of the receiving or sending of a letter, he can hardly be equally positive that it was more than 11 and less than 12 months ago.

Possibly the plaintiffs, in saying the last year, did not have reference to the year preceding the date of their testimony, but to the year preceding the date of the filing of their suit; that is to say, not to the year preceding the 31st of May, 1901, but to the year preceding the 8th of April, 1901. Granting this to be so, still they were testifying as to a very narrow margin of time, and their vague and general statement is of very little worth as proof.

Mrs. Covarrubias must have had information at least before the 27th of April, since her power of attorney bears that date, and

she hardly executed it on the same day on which it was applied for. In view of the fact that his own attorney in the case, Mr. Flynn, was possessed of the information before October 14, 1899, the "shortly before" May 12, 1900, of Sherburne Choppin, who was living in the same city with this attorney, does not necessarily mean that this information reached him after April 8, 1900. Under the circumstances, "shortly before" May 12, 1900, might well extend beyond a space of 24 days. Mr. Flynn's "about 10th or 11th of April," and "possibly before that date," does not necessarily mean after April 8th.

Plainly, by such vague and general statements the plaintiffs have not discharged the burden of proof resting upon them to show at what date they discovered the alleged fraud.

On the other hand, the defendant, by the testimony of Judge Sherburne, has shown positively that it was several months before the 12th of May, 1900, and consequently before the 8th of April, 1900. If this testimony of Judge Sherburne was wrong, plaintiffs should have shown the fact by the production of the letters which must have passed between the parties.

It will hardly be contended that plaintiffs learned the facts on which they brought their suit from reading their own petition in the newspapers. The proposition that they did would be on the same order as that of a man lifting himself by the straps of his boots.

The plea of prescription must be maintained.

Counsel for plaintiffs say:

"It is useless to discuss the prescription of one year, for another reason, and that is, it has no application. In fact, the securities described in plaintiffs' petition went into the possession and control of Mrs. R. L. Dauphin as executrix, and under the title of executrix. There must be, at least, a change in the nature and character of her title under which she holds these securities, and as she still holds these securities, so far as the parties are concerned, and so far as the public is concerned, under her title as executrix, prescription has never begun to run."

What is here said would be applicable were the defendant pleading the prescription acquirandi causa; but she is not. She is pleading the prescription by which a judgment cannot be attacked for fraud after one year from the discovery of the fraud. The question is not as to the character of her possession, or as to the enormity of her alleged fraud, but purely and simply as to the date when the discovery of the alleged fraud was made by the plaintiffs. This date being settled, and it proving to be more than one year before the filing of the suit, the attack on the judgment must fail.

Counsel say further:

"It is, at all events, a startling doctrine that an executrix, an officer of court, can secure the possession of the property and securities of a succession, can conceal that possession, make a false inventory, false accounting, not even mentioning such securities, and be protected by the false judgment which she obtained upon the basis of her fraudulent concealment, fraudulent inventory, and fraudulent accounting by the prescription of one year. Such a doctrine would be but a premium on the spoliation of trust funds by faithless officials."

The result here described cannot be so very startling to the learned counsel in this case, familiar as they are with the operation of the law by which a judgment cannot be attacked for fraud after one year from the discovery of the fraud, no matter how gross or outrageous the fraud may be; and familiar as they are with the fact that a judgment, so long as it stands, is res judicata of the issues involved in the suit in which it has been rendered, and that res judicata can do even more than perpetuate a fraud—that it can, as has been said, make black white, and the crooked straight.

But these observations of counsel, while

entirely wrong as a matter of law, appear to have a good deal of support and justification in the facts of the case. Because of this, and because also of the importance of this litigation, and for the further reason that the judgment below was apparently in favor of plaintiffs (we say apparently, and our reason is that in reality the lower court did not pass on the question of whether or not the property in controversy was acquired by Dauphin before the dissolution of the first community, which now, the second supplemental petition and the intervention having been eliminated, is the only issue in the case), we say, in view of the foregoing circumstances, we have gone to the trouble to make a careful examination of the facts, and we proceed to give the result, even at the risk of exposing ourselves to the imputation of dealing with a case against which prescription has shut the door of the court, and which therefore is not before us.

### On the Merits.

As just stated, the question now is whether certain property described in the petition was acquired during the first community, and was still in the possession of Dr. Dauphin at his death. The property is alleged to have consisted in the following:

| | |
|---|---|
| 8 bonds of the N. O. City & Lake R. R. Co. of $500 each...................... | $  4,000 00 |
| 6 bonds of the Crescent City R. R. Co. of $1,000 ............................. | 6,000 00 |
| 40 La. Consol. 4% bonds of $1,000 each..... | 40,000 00 |
| 20 bonds of the City of N. O. Extended, $1,000 each ............................. | 20,000 00 |
| 40 bonds of the N. O. Waterworks Co. at $500 each............................. | 20,000 00 |
| 40 bonds Morgan's R. R. Co. of $1,000 each | 40,000 00 |
| 20 bonds of the N. O. & Carrollton R. R. Co., $1,000 each.......................... | 20,000 00 |
| 275 premium bonds of the City of N. O., $20 each ................................. | 5,500 00 |
| Making a total of...................... | $155,500 00 |

—to which is to be added $50,000 in cash.

Taking up the items in regular order, we find the evidence as to them to be as follows:

(1) Eight bonds of the New Orleans City & Lake Railroad Company.

There is no evidence to show that Dr. Dau-

phin purchased or owned these bonds at any time during his life. In the plaintiffs' brief the statement is made in connection with these bonds: "Unable to trace derivation of defendant's title."

(2) Six bonds of Crescent City Railroad Company.

The testimony shows that these bonds were taken by Dr. Dauphin in payment of loans made by him between December 29, 1883, and July 17, 1884, and that, therefore, they were acquired after the dissolution of the first community, which was on the 2d of August, 1883. Plaintiffs say the loans were made out of community funds, but there is no proof of it.

(3) Twenty bonds of New Orleans & Carrollton Railroad.

These bonds were acquired on July 17, 1884, long after the dissolution of the first community, and it is not shown that they were acquired with the money of the first community.

(4) Forty Louisiana Consolidated 4 per cent. bonds.

The evidence does not show any state bonds in the possession of Dr. Dauphin previous to 1886. Plaintiffs fail to show, therefore, that these bonds belonged to the first community.

(5) Twenty bonds of the city of New Orleans.

As to these bonds the record contains no evidence.

(6) Forty bonds of New Orleans Waterworks Company.

What evidence there is as to the acquisition of these bonds by Dr. Dauphin would show he acquired them in 1886, three years after the dissolution of the first community.

(7) Forty bonds of Morgan Railroad Company.

It is shown that Dr. Dauphin had some of these bonds in 1886. As to how long he had had them, nothing is shown. One witness, indeed, testifies that he saw Morgan Railroad

bonds in the bank box of Dr. Dauphin in July, 1883, a month before the dissolution of the first community; but this statement is shown, by a comparison with the testimony of the witness himself on the trial in 1892, to be entirely unworthy of credit.

As to the other items there is no evidence whatever, except such evidence as would give rise to an inference that Dr. Dauphin during the first community had considerable means, but not necessarily to a greater amount than the $60,000 at which the estate of the first community was fixed by the judgment of 1892.

A perfectly reliable witness says that in 1879 he heard Dr. Dauphin say that he was not then worth $10,000. Another witness testifies that Dr. Dauphin, about a month before the death of his first wife, being himself very ill and expecting to die at any time, told him he was worth only $60,000 or $70,000.

The evidence is that Dr. Dauphin failed in business and began life anew in 1868; that he was an honest man, and averse to speculation, and sought safe investments promising sure returns.

In January, 1869, he entered the service of the Louisiana Lottery Company as a clerk. After a couple of years he was discharged on account of the dull business of the company, but shortly afterwards was re-employed in the same capacity. He became president of the company "about in 1875."

As to his salary, we find in the record of the suit of 1892 the following memorandum of evidence:

"Salary of M. A. Dauphin, as far as my recollection serves me: January 17, 1869, to December 31, 1871, $200 a month; May 18, 1872, to November, 1874, $200 a month; November, 1874, to January, 1876, $250 a month; January, 1876, to January, 1877, $300 a month; January, 1877, to January, 1882, $6,000 a year; January, 1882, to July,

1885, $10,000; July, 1885, to time of death, at $15,000 a year."

He seems to have acquired some shares of stock of the Louisiana Lottery Company early in the existence of that company, when its stock must have been rated very low. He held at first 30 shares, and from 1876 to the date of his death he held 56. As to what were the dividends on this stock during the existence of the first community there is no evidence, but we find that from the dissolution of the first community to the date of Dr. Dauphin's death they amounted to $49,560.

We find also that the market value of this stock was as follows: In July, 1879, 80 bid, 100 asked; in August, 1879, 125 asked; in February, 1880, 150 asked; in May, 1880, 250 asked; in 1882, 400; in February, 500; in June, 550; in July, from May to August, 1883, 600 asked.

Judging from the gradual increase in the salary of the president and in the market value of this stock, and assuming that the stock previous to 1879 did not rule higher than 80, the inference is that the earnings of the stock were very much greater in the decade following the dissolution of the first community than in the decade preceding it—at least twice as great.

Going by these data, the amount received by Dr. Dauphin by way of salary from 1869 to August, 1883, would be $66,300, and by way of dividends $24,780, or a total of $91,080. To this amount must be added some occasional gratifications or extra pay the lottery company was in the habit of giving its employés, of which the amount is not fixed even approximately, and also the interest and dividends on his investments as he gradually increased his fortune.

Against this must be charged his expenses and charities and liberalities. The testimony is that he "was liberal in his living; he liked comforts, and used to give away a

great deal of money; he used to give money to the orphan asylums, and among people that nobody heard about. He lived well." "He was very liberal to his wife's family, the Choppins." That in his home "there was nothing lacking; it was a gentleman's house all over."

What rate of expense this mode of living can have entailed can only be conjectured. This expense was greatly increased in the latter years of the first community by the constant and serious illness of the wife and Dr. Dauphin's own infirm condition of health, doubtless entailing heavy medical expenses.

Under this evidence we do not think a probable case is made out of the fortune of Dr. Dauphin having been greater at the dissolution of the first community than the amount at which it was fixed in the judgment of July 17, 1892.

The burden was on plaintiffs to make out their case, nor did this burden shift at any time to the defendant. It is not pretended that the connection of defendant with the property, or her knowledge of it, began before the death of Dr. Dauphin, eight years after the dissolution of the first community; and, assuming that the property was acquired by Dauphin, nothing shows that defendant has the slightest knowledge of when or how it was acquired. The situation is not at all the same as it would have been had the issue been as to whether the property had belonged to the succession of Dr. Dauphin, for then the burden would have shifted to defendant to account for her possession of all of that part of the property shown to have been acquired by Dr. Dauphin during his lifetime.

Counsel for defendant make the statement, and the circumstances of the case lend it much plausibility, that the learned counsel for plaintiffs fully themselves realized at the closing of the evidence that they had failed to make out a case for their clients, and that

it was then they bethought themselves of filing the second supplemental petition and the intervention, so as to change the issue from whether the first community had or had not owned the property in question to whether or not the succession of Dauphin owned it. Had the learned counsel believed that the case as propounded in the original and first supplemental petitions had been made out, they would hardly, in their answer to the intervention, have made the plaintiffs join in asking the relief prayed for by the interveners, which was inconsistent with the relief prayed for in the original and first supplemental petitions; and they would hardly have made the interveners "deny the right of plaintiffs at this time to the specific relief sought in the original and [first] supplemental petitions."

Both on the plea of prescription and on the merits of the case, the judgment must be against the plaintiffs. It goes without saying that the plea of prescription thus sustained has no application to the intervention.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that there be judgment rejecting plaintiffs' demand at their costs in both courts, and dismissing the intervention at the cost of the interveners, but without prejudice to their right to institute a separate action.

See dissenting opinion of BREAUX, J., 36 South. 305.