PROVOST'S, J.
This suit is brought by the trustee in bankruptcy of Cleopha Benoit to set aside as null, under paragraph 67e of the bankruptcy act of 1898, a sale of land made by the bankrupt to the defendant Seharff within four months prior to the filing of the petition in bankruptcy. The estate had been closed, but was reopened, and the same trustee was reappointed, for the purpose of bringing this suit. The only defense that need be examined is that of prescription.
[1] Section 11, par. “d,” of the bankruptcy act, reads as follows:
“Suits shall not be brought by or against a trustee of a bankrupt estate subsequent to two years after the estate has been closed.”
Section 2 of said act, subhead 8, provides:
“Close the estates, whenever it appears that they have been fully administered, by approving the final accounts and discharging the trustees.”
In this case the estate was “closed” on June 28, 1905, and the present suit was filed on January 7, 1909. The prescription period of two years had therefore elapsed before the suit was filed.
The learned counsel for plaintiff argues that in the present case the estate “had not been fully administered,” since the property now being sued for had not been included in the administration.
The answer to this is twofold: First, that, while the property now being sued for may have been recoverable for the creditors of the bankrupt estate, on the ground that the sale of it had been made in fraud of their rights, it did not belong to the said estate— was not the property of said estate — so long as the sale had not been set aside; for the said sale was not a pure simulation, but was real and translative of ownership, albeit, perhaps, fraudulent and annullable at the suit of the creditors, or of the trustee in bankruptcy, their legal representatives; and, secondly, the above-quoted provision of the bankruptcy act provides how estates shall be closed. “Close the estates,” it says, “by approving the final accounts and discharging the trustees.” And that is what was done in the present case; the final account was approved, all the funds were distributed, and the trustee was discharged. The estate, therefore, was closed, within the meaning of the above prescriptive provision.
If this prescription could apply only in cases where all the property fraudulently disposed of by the bankrupt, and therefore recoverable for the estate, had been fully administered, it could apply in no case, and could have no operation, for it is only in cases where property has thus been disposed of and is thus recoverable that it does have operation. Naturally it can have no operation in eases where the bankrupt has duly surrendered all his property, and there is none to be sued for.
[2] It is next contended by plaintiff that the prescription runs only from the date of the discovery of the fraud, and that in the present ease the fraud was discovered only about a month before the filing of the suit.
The evidence goes to show that during the pendency of the bankruptcy proceedings the trustee had, or might readily have had, all the evidence he has produced in this case, save, perhaps, the positive and direct testimony of the bankrupt, Benoit, to the fraud. The plaintiff trustee testified as follows:
“Q. Did you cause him (referring to Judge Overton, his attorney) to make any investiga *221 tion relative to the disposition of this land which Benoit had made in Texas? A. We made an investigation. We could not got anything at this end of the route; only a little surmise that such a thing had been done. We could get nothing definite, and it was late in the proceedings. * * * I told my attorney what I had heard, and he started an investigation, which he continued for some time, * * * and he spent some money — I don’t remember how much, probably $25 or $30 — and finally he reported to me that the investigation did not amount to anything; that he cotdd not get anything tangible. * * *
“Q. Mr. Kinder, what is it you heard about his selling land m Texas that caused you to make that investigation? A. Somebody, I don’t remember who it was, asked me if Benoit had turned in that land that he had in Texas. I don’t remember who it was, and I examined the schedule, and I saw there was nothing in reference to lands in Texas. Whoever it was told me what county it was in. and we started without any information in regard to it, and I turned the matter over to my attorney, and he made the investigation and advised me that it wasn’t worth while to.
it? Q. Did you ask Mr. Benoit anything about
“A. No; I never asked Mr. Benoit anything about it that I remember of.
“Q. After you found out it was sold to Mr. Scharff, did you ask him about it?
“A. No, sir.
“Q. You were acquainted with Mr. Scharff?
“A. Yes, sir.
“Q. Did you ever ask Mr. Martin, the notary before whom the deed was passed? A. I never found out who passed the deed. I never was able to ascertain anything at this end of the line; everything was shut out.
“Q. Mr. Kinder, was there anything in the Benoit bankruptcy which aroused your suspicion at all that there had been fraud committed? A. Nothing, except that land.
“Q. You say that land — you mean the Texas land? A. I mean the Texas land — well, there was some other things, too. I will say that there were other things we inquired into ; there ■was a sale of some stock down there, and we had a hearing or two before Judge Taylor in regard to stock that Mr. Benoit had sold, and we had one or two hearings before the referee, and the investigation proved that Mr. Benoit had sold the stock for his son.
“Q. So, then, if I understand you correctly, at that time you had a suspicion in your mind that something of a fraudulent nature regarding the sale of this Texas land? A. All I could get was a little hint of this thing. I could not find a man in Welsh who would tell me anything about it.
“Q. Mr. Kinder, you never had Mr. Scharff, nor Mr. Martin, nor Mr. Welsh, nor Mr. Benoit, summoned before the referee in bankruptcy and asked them about this land prior to the time when you were discharged as trustee in the original appointment? A. I did not know that Mr. Martin or Mr. Welsh knew anything about it?
“Q. Did you have either one of these that I have mentioned summoned before the referee and interrogate them? A. No, sir; not at that time, for this reason: That it seemed like one big community, and they were all friends, and would not tell anything about it. I don’t remember the individuals — who they were; but I questioned parties around Welsh, and they would give me some evasive answer and walk off. I turned the matter over to my attorney, and we kept it up until he said it was useless to spend any more money on an uncertainty. He said there might be an equity in it for the creditors, and there might not. He said it was not worth while to spend any more money.
“Q. When was it that .you first ascertained positively that this sale had been made, as alleged by you in your petition? A. » * * Yes; positively since the case was reopened.”
Mr. Winston Overton, now judge, was the attorney for the trustee. He wrote to lawyers in Texas, where the land in question is situated, concerning the status of the land, and in due course received letters in reply.
“Q. Judge, after receiving these letters, what did you do?
“A. I considered the matter and, under all circumstances that were before me at the time, I felt that there would be no equity in the event we instituted suit and succeeded with the suit; that is to say, no equity in the land after the sale at forced sale for the creditors. Then I took the letters and went over to General Taylor’s office. He was then referee in bankruptcy, and I made a verbal report to him and filed these with it as a part of my report, and took no further steps in the matter.
“Q. Explain why there would be no equity, if the land was sold at forced sale?
“A. In favor of the creditors?
“Q. Yes, sir.
“A. That was simply my conclusion; in other words, I was at that time under the impression or belief that lands were deteriorating in value, and if I mistake not it was on account of the crop conditions.
“By the Court: On account of what?
“A. Crop conditions. Furthermore I knew that there, or felt that there, were two mortgages on the land which I believed to be good mortgages, and I thought that after the expenses of the litigation were paid and after the land was sold at forced sale and the mortgage indebtedness paid, which I thought to be a valid indebtedness, that there would be little or nothing for the creditors; in other words, it was scarcely worth while to make the attack. I got no further than that.
“I made an investigation to learn if there was or was not fraud in the transaction. I felt that *223 it was susceptible of attack, and I felt this largely because Mr. Benoit and Mr. Scbarff resided in the parish of Calcasieu and pie land was situated in Texas, and the consideration seemed to be large, and I doubted whether or not Mr. ScharfE would buy land costing- as much as that seemed to cost, situated in the state of Texas, and especially as I did not know at that time, or before, that Mr. ScharfE was a man of considerable means, though I knew he was a man of ordinary means, or at least believed so. In other words, I thought he would keep his money over here, instead of going to Texas with it under the circumstances. I gave my impressions to Gen. Taylor (then referee, having charge of the Benoit bankruptcy), and, while I thought probably the sale was susceptible to attack because of the surrounding circumstances, yet I did not feel as if the creditors were gaining anything by it, even should we succeed in setting it aside. * * *
“No, sir; I did not have sufficient evidence to set it aside at that time. In other words, if this mortgage had not existed on the land, I would have asked the trustee to make investigations and find out whether or not the evidence could be had upon which my suspicions could be verified; or, in other words, proved to be correct and well founded.”
It appears from the foregoing that, during the pendency of the bankruptcy proceedings, the plaintiff suspected the existence of the fraud now sought to be relied upon, and that, If the inquiries concerning same were not prosecuted further, it was simply because, owing to the fact that there were mortgages upon the property, the doing so was not supposed to be worth while. Not only the suspicions of the plaintiff were fully aroused, and not only plaintiff was possessed of all the facts referred to above, but plaintiff had the right to summon the bankrupt before the referee and submit him to an examination under oath concerning his affairs. Had this been done, the bankrupt would have had either to perjure himself or make, then and there, the statements which he has made in the present case, upon which the plaintiff is relying in the present case for showing the fraudulent character of the transaction. The court cannot gratuitously assume that the bankrupt would have perjured himself. But whether he would have done so or not is really immaterial, since a litigant who has voluntarily abstained from availing himself of the means put in his hands by the law itself for the ascertainment of a suspected fact cannot be allowed to plead his ignorance of such fact for arresting the course of the statute of prescription and repose. The law upon that point is fully settled.
In Wood v. Carpenter, 101 U. S. 135, 25 L. Ed. 807, the Supreme Court of the United States said:
“It will be observed, also, that there is no averment that during the long period over which the transactions referred to extended the plaintiff ever made or caused to be made the slightest inquiry in relation to either of them. The judgments confessed were of record, and he knew it. _ It could not have been difficult to ascertain, if the facts were so, that they were shams. The conveyances to Alvin and Keller were also on record in the proper offices. If they were in trust for the defendant, as alleged, proper diligence could not have failed to find a clew in every case that would have led to evidence not to be resisted. With the strongest motives to action, the plaintiff was supine. If underlying frauds existed, as he alleges, he did nothing to unearth them. It was his duty to make the effort.”
See, also, Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. Ed. 719; Lant v. Manley, 71 Fed. 19; Johnston v. Standard Mining Co., 148 U. S. 370, 13 Sup. Ct. 585, 37 L. Ed. 485; Pearsall v. Smith, 149 U. S. 236, 13 Sup. Ct. 833, 37 L. Ed. 717; Jones v. Smith (C. C.) 38 Fed. 381; Jessupp v. Ill. Central R. R. Co. (C. C.) 43 Fed. 561.
And that the doctrine of these cases has been fully adopted by this court, see Citizens’ Bank v. Jeansonne, 120 La. 399, 45 South. 367; Poirier v. Cypress Co., 127 La. 936, 54 South. 292; Succession of Dauphin, 112 La. 103, 36 South. 287.
The plea of prescription of two years must therefore be sustained.
The judgment appealed from is set aside, and the suit is dismissed at plaintiff’s costs.